# STOCKING DISTRIBUTOR AGREEMENT

This Stocking Distributor Agreement (this "**Agreement**") is entered into as of November 1, 2019 ("**Effective Date**") by and between **RC3 INNOVATIONS, LLC D/B/A ADVANTAGE MEDICAL** ("**Stocking Distributor**") a Georgia limited liability company whose address is 70 Gruber Lane, Suite 257, Saint Simons Island, Georgia, 31522 and **DIO MEDICAL CORPORATION**, a Wisconsin corporation, whose address is 2900 Potshop Lane, Suite 200, Eagleville, PA 19403 ("**Seller**").  This Agreement may refer to Stocking Distributor or Seller as a "**Party**," or collectively as the "**Parties**."

WHEREAS, Seller is in the business of manufacturing, producing, and/or selling the Products (as defined below);

WHEREAS, Stocking Distributor desires to distribute the Products to customers on a buy/resale basis, subject to the terms and conditions of this Agreement; and

WHEREAS, Seller desires to appoint Stocking Distributor as a non-exclusive distributor under the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions set out herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

1. **APPOINTMENT**

    1.1 <u>Certain Definitions</u>. For purposes of this Agreement, the terms "**Products**," and "**Territory**" mean the products identified in Exhibit 1 and territory specified in Exhibit 2 of this Agreement.

    1.2 <u>Non-Exclusive Appointment</u>. Seller hereby appoints Stocking Distributor to act as a non-exclusive distributor of Products to customers located in the Territory during the Term (as defined in Section 11.1) in accordance with the terms and conditions of this Agreement.

    1.3 <u>Stocking Distributor Personnel</u>. Stocking Distributor may appoint subdistributors as it determines appropriate for the effective distribution of Products under this Agreement ("**Stocking Distributor Personnel**") however:

    (a) Stocking Distributor shall be solely responsible for the hiring, compensation, termination and all other matters related to Stocking Distributor Personnel;

    (b) Stocking Distributor shall ensure that Stocking Distributor Personnel: (i) act at all times in the best interests of Seller; and (ii) are properly trained and knowledgeable regarding the Products; and

    (c) Stocking Distributor shall ensure that Stocking Distributor Personnel act at all times in conformance with Stocking Distributor's obligations under this Agreement.

2. **PERFORMANCE OBLIGATIONS**

    2.1 <u>Stocking Distributor Obligations</u>. Stocking Distributor shall:

    (a) use reasonable efforts to solicit sales of and promote the Products within the Territory;

    (b) conduct all business relating to the Agreement in Stocking Distributor's name and clearly identify itself as an entity separate from Seller;

    (c) secure and maintain all appropriate and necessary business registrations and licenses at its own expense;

    (d) provide its own vehicles, supplies, facilities, and services as necessary to fulfill its obligations hereunder at its own expense;

    (e) shall not resell any Products that have been returned to Stocking Distributor without Seller's prior written consent;

    (f) ensure that all communications and representations to customers, prospective customers and all other parties shall be true, accurate, complete, and consistent with the labeling of the Products;

    (g) under no circumstances modify, repackage, adulterate, misbrand, alter, or add labels to or remove labels from any of the Products;

Complaint Ex A-1

Doc ID: 015d268f41fcccb01f1c30bac1ad19666541ad43

- (h) take no action or make any statement that is or could be detrimental to the reputation and goodwill of Seller;
- (i) not use any advertising or marketing materials relating to the Products unless approved by Seller;
- (j) under no circumstances modify, amend or alter advertising or marketing materials approved by Seller; and
- (k) use reasonable efforts to assist Seller in any recall or retrieval efforts.

2.2 <u>Seller Obligations</u>. Seller shall:

- (a) provide any necessary information, material, and support or as Stocking Distributor may request regarding the marketing, advertising, promotion, and sale of Products, free of charge to Stocking Distributor;
- (b) allow Stocking Distributor to participate, at its own expense, in any marketing, advertising, promotion and sales programs or events that Seller may make generally available to its most favored authorized distributors of Products;
- (c) provide any necessary cooperation and information as Stocking Distributor may reasonably request regarding the marketing, advertising, promotion and sale of Products;
- (d) provide technical support to Stocking Distributor's customers and, as reasonably requested by Stocking Distributor, provide support contact information, escalation procedures and any other support-related information to Stocking Distributor for all Products; and
- (e) shall maintain in effect all the licenses, permissions, authorizations, consents, and permits that it needs to carry out its obligations hereunder.

3. **PRICES AND PAYMENT**

    3.1 <u>Terms of the Sale</u>. Seller shall make available and sell Products to Stocking Distributor at the Prices and on the terms and conditions set out in this Agreement.

    3.2 <u>Price</u>. Stocking Distributor shall purchase the Products from Seller at the prices specified in Exhibit 1 of this Agreement or, if not specified in Exhibit 1, Seller's distributor price list in effect when Seller accepts the related purchase order ("**Prices**").

    3.3 <u>Taxes</u>. All Prices are inclusive of all sales, use and excise taxes, and any other similar taxes, duties and charges of any kind imposed by any governmental authority on any amounts payable by Stocking Distributor under this Agreement.

    3.4 <u>Payment Terms</u>. Seller shall issue monthly invoices to Stocking Distributor for all Products ordered in the previous month. Stocking Distributor shall pay all invoiced amounts due to Seller within forty-five (45) days after Stocking Distributor's receipt of such invoice. Distributor shall make all payments in US dollars by check, wire transfer, or as otherwise instructed by Seller.

    3.5 <u>Invoice Disputes</u>. Stocking Distributor shall notify Seller of any dispute with any invoice (within sixty (60) days from the date of the invoice. If Seller does not receive such dispute notification in the time set forth above, Stocking Distributor will be deemed to have accepted and acknowledged the invoice as correct, and shall pay all undisputed amounts due under the invoice within the period set out in Section 3.4. The Parties shall seek to resolve all disputes expeditiously and in good faith. Notwithstanding anything to the contrary, both Parties shall continue performing their obligations under this Agreement during any dispute.

4. **ORDERS PROCEDURE**

    4.1 <u>Purchase Orders</u>. Stocking Distributor shall provide purchase orders to Seller in written form via facsimile, e-mail, or by telephone. By placing a purchase order, Stocking Distributor makes an offer to purchase Products under the terms and conditions of this Agreement.

    4.2 <u>Acceptance and Rejection of Purchase Orders</u>. Seller may accept any purchase order by confirming the order (whether by written confirmation, invoice or otherwise) or by delivering the Products, whichever occurs first. No purchase order is binding on Seller unless accepted by Seller as provided in this Agreement.

Complaint Ex A-2

Doc ID: 015d268f41fcccb01f1c30bac1ad19666541ad43

5. **SHIPMENT AND DELIVERY**

   5.1   <u>Shipment and Delivery Requirements</u>. Seller shall deliver the Products in the quantities and to the addresses as specified in the relevant purchase order or as otherwise agreed by the Parties.

   5.2   <u>Title and Risk of Loss</u>. Title and risk of loss/damage passes to customer upon delivery and acceptance by a customer if the Products are delivered directly to customer at the address identified in the purchase order. Title and risk of loss/damage passes to Stocking Distributor upon delivery and acceptance by the Stocking Distributor if the Products are delivered directly to the Stocking Distributor.

   5.3   <u>Certain Definitions</u>. For purposes of this Agreement, the term "**Nonconforming Products**" means any product received by Stocking Distributor or customer from Seller under a purchase order that: (a) is not a Product; (b) does not conform to the make/model or other product identifier listed in the applicable purchase order; or (c) is defective.

   5.4   <u>Shipment of Non-Conforming/Excess Goods</u>. Stocking Distributor shall ship all Nonconforming Goods to Seller at its address identified in this Agreement at Seller's sole cost and expense. If requested by Stocking Distributor, Seller shall replace Nonconforming Goods, at no additional cost to Stocking Distributor.

6. **CUSTOMER SUPPORT AND RECALLS**

   6.1   <u>Customer Support</u>. Seller shall be responsible for all support and service requirements of end-users of the Products and shall maintain end-user complaint files in compliance with industry standards and applicable governmental requirements. In addition, Seller shall be responsible for end-user training as to Products with end-users.

   6.2   <u>Customer Complaints</u>. Stocking Distributor shall engage in all communications with the end-users to whom Stocking Distributor sells Products. Stocking Distributor shall communicate to Seller within thirty (30) days of any complaints that Stocking Distributor believes are attributable to the Products.

   6.3   <u>Recalls.</u> If there is a significant problem with any Products that may affect the Products' performance, or if any governmental or regulatory authority in the Territory issues a request, directive, or order that any Products be recalled or withdrawn, or such request, directive, or order is imminent, or if a court of competent jurisdiction orders such a recall or withdrawal, Seller shall determine in its sole discretion whether a product recall is necessary, and Seller shall administer any recall in accordance with applicable governmental regulations. To the extent that a recall results from any cause or event arising from design, manufacture, or shipment of the Products, Seller (or Seller's source) shall be responsible for the expense of the recall. The Parties shall cooperate to efficiently effectuate the recall. For purposes of this Agreement, expenses of recall shall include, without limitation, the expenses of notification, destruction, and return of the recalled or withdrawn Products, replacement Products, and Stocking Distributor's and Seller's costs for the Products recalled or withdrawn.

   6.4   <u>Sales Reports</u>. Stocking Distributor and Seller will maintain records of all Products sold in the Territory (the "**Tracking Report**"). The Tracking Report shall contain sufficient information to permit complete and rapid withdrawal of Products from the market. If a recall or the withdrawal of the Products shall occur, Stocking Distributor shall reasonably assist Seller to ensure prompt and safe recall or withdrawal of the Products from the customer and the Territory.

   6.5   <u>Notification of Complaints</u>. Stocking Distributor shall immediately notify Seller of:

   (a)   Any event that might require Seller to file a report or otherwise comply with any applicable law, rule, or regulation governing medical devices;

   (b)   Any product malfunction which, were it to recur, would likely to cause serious injury or death; or

   (c)   Any serious device effects to a patient.

7. **INTELLECTUAL PROPERTY RIGHTS**

   7.1   <u>Ownership</u>. Subject to the express rights and licenses granted by Seller in this Agreement, Stocking Distributor acknowledges and agrees that:

<span style="color:red">Complaint Ex A-3</span>

Doc ID: 015d268f41fcccb01f1c30bac1ad19666541ad43

    (a)      any and all Seller's patents, trademarks, licenses, and any other intellectual property rights related to the Products (collectively, "**Intellectual Property Rights**") are the sole and exclusive property of Seller or its licensors;

    (b)      Stocking Distributor shall not acquire any ownership interest in any Intellectual Property Rights under this Agreement;

    (c)      any goodwill derived from the use by Stocking Distributor of Intellectual Property Rights inures to the benefit of Seller or its licensors, as the case may be; and

    (d)      Stocking Distributor shall use the Intellectual Property Rights solely for the purposes of performing its obligations under this Agreement and only in accordance with this Agreement and the instructions of Seller.

7.2    <u>Seller's Trademark License Grant.</u> This Agreement does not grant either Party the right to use the other Party's or their affiliates' trademarks. Subject to the terms and conditions of this Agreement, Seller hereby grants to Stocking Distributor a non-exclusive, non-transferable and non-sublicensable license to use Seller's trademarks in the Territory during the Term solely on or in connection with the promotion, advertising and resale of the Products in accordance with the terms and conditions of this Agreement. Stocking Distributor will promptly discontinue the display or use of any trademark to change the manner in which a trademark is displayed or used with regard to the Products when requested by Seller. Other than the express licenses granted by this Agreement, Seller grants no right or license to Stocking Distributor, by implication, estoppel or otherwise, to the Products or any Intellectual Property Rights.

8. **NON-SOLICITATION**

    8.1    <u>Non-solicitation of Employees</u>. Each Party agrees and covenants that, during the term of this Agreement and for two (2) years after the termination or expiration of this Agreement (for any reason), neither Party shall directly nor indirectly solicit, recruit, attempt to hire or recruit, or induce any employees, contractors, or personnel of the other Party to terminate their employment relationship with that Party. This non-solicitation provision explicitly covers all forms of oral, written, or electronic communication, including, but not limited to, communications by email, regular mail, express mail, telephone, fax, instant message, and social media, including, but not limited to, Facebook, LinkedIn, Instagram, and Twitter, and any other social media platform, whether or not in existence at the time of entered into this Agreement.

    8.2    <u>Non-solicitation of Stocking Distributor Customers</u>. Seller understands and acknowledges that Stocking Distributor has expended and continues to expend significant time and expense in developing customer relationships, customer information, and goodwill. Seller understands and acknowledges that the loss of this customer relationship and/or goodwill will cause significant and irreparable harm to Stocking Distributor. Seller agrees and covenants that, during the term of this Agreement and for two years after the termination or expiration of this Agreement (for any reason and regardless of whether this Agreement is terminated at the option of the Seller or Stocking Distributor), Seller shall not directly or indirectly solicit, contact (including but not limited to email, regular mail, express mail, telephone, fax, and instant message), attempt to contact, or meet with Stocking Distributor Customers. For purposes of this Section 8.2, "**Stocking Distributor Customers**" shall mean (i) customers who purchased Products or services from Stocking Distributor, and/or (ii) customers who purchased Products directly from Seller as a result of Stocking Distributor's efforts and with whom Seller had no relationship prior to the effective date of this Agreement.

    8.3    Notwithstanding to the above, Seller has a relationship with a customer explicitly identified in Exhibit 2 (the "**Excluded Customer**") and as such the above clause 8.2 will not apply to said Excluded Customer.

9. **RELATIONSHIP OF THE PARTIES**

    9.1    <u>Independent Contractor Status</u>. Stocking Distributor's relationship to Seller will be that of an independent contractor. Seller will not maintain control over the manner in which Stocking Distributor will perform its duties hereunder, and Seller will not maintain control over the methods and procedures to be utilized by Stocking Distributor. Stocking Distributor and Stocking Distributor Personnel will not be considered, under the provisions of this Agreement or otherwise, as having employee status and Seller shall not be obligated to pay or withhold any income, FICA,

<span style="color:red">Complaint Ex A-4</span>

unemployment or other employee tax from amounts payable to Stocking Distributor or Stocking Distributor Personnel. Any and all taxes and other amounts due on compensation paid hereunder to Stocking Distributor and Stocking Distributor Personnel will be the sole responsibility of Stocking Distributor.

9.2 <u>Stocking Distributor Authority</u>. Stocking Distributor shall not have, and shall not represent itself as having, any authority to pledge Seller's credit or give any condition or warranty or make any representation on Seller's behalf or commit Seller to any agreements. Further, Stocking Distributor shall not, without Seller's prior written consent, make any promises or guarantees relating to the Products beyond those contained in this Agreement or otherwise incur any liability on behalf of Seller.

10. **AUDIT/INSPECTION RIGHTS**

    10.1 <u>Audit</u>. Stocking Distributor shall maintain appropriate documentation necessary to demonstrate Stocking Distributor's compliance with applicable law and regulations, and as otherwise necessary to comply with the terms of this Agreement. The documentation refers to records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of funds relating to this Agreement.

11. **TERM; TERMINATION**

    11.1 <u>Term</u>. The initial term of this Agreement commences on the Effective Date and lasts for a period of one (1) year (the "**Initial Term**"). Thereafter, this Agreement shall automatically renew for additional successive periods, each equivalent to the Initial Term. However, either Party may terminate this Agreement for any reason by providing thirty (30) days advance written notice. Unless earlier terminated in accordance with this Agreement's terms, this Agreement terminates on the expiration of the then-current term. The entire duration of this Agreement, until termination or expiration, is referred to as the "**Term**."

    11.2 <u>Immediate Termination Rights</u>. Either Party may terminate this Agreement immediately, upon notice to the other if a Party:

    (a) commits a material breach of this Agreement or breaches a representation or warranty;

    (b) provides the other Party with false or misleading information;

    (c) misrepresents, modifies, repackages, adulterates, misbrands, alters, adds labels to or removes labels from, Products;

    (d) takes any action or makes any statement that is or could be detrimental to the reputation and good will of the other Party;

    (e) engages in practices or makes representations to any customer, potential customer or other third party that are misleading, incomplete, fraudulent, untrue, inconsistent with Product labeling, or contrary to the terms of this Agreement;

    (f) fails to cooperate in Product retrievals or recalls;

    (g) misuses or discloses the other Party's Confidential Information;

    (h) if either Party becomes insolvent or a receiver is appointed or is declared bankrupt;

    (i) fails to notify the other Party within thirty (30) days of a material change in a representation or warranty or any event that renders or materially alters a prior representation or warranty.

    11.3 <u>Effect of Expiration or Termination</u>. Upon the expiration or earlier termination of this Agreement:

    (a) Seller shall complete all pending purchase orders that have been paid for by Stocking Distributor; and

    (b) Each Party shall promptly return all documents and tangible materials (and any copies) containing, reflecting, incorporating or based on the other Party's Confidential Information.

    11.4 <u>Post-Term Resale</u>. On the expiration or earlier termination of this Agreement, Stocking Distributor may, in accordance with the applicable terms and conditions of this Agreement, sell off its existing inventories of Products.

12. **CONFIDENTIAL INFORMATION**

12.1 From time to time during the Term, a Party (the "**Disclosing Party**") may disclose or make available to the other Party (the "**Receiving Party**") information about its business affairs, products, confidential intellectual property, trade secrets, third-party confidential information and other sensitive or proprietary information (collectively, "**Confidential Information**"). Confidential Information shall not include information that, at the time of disclosure is: (a) in the public domain; (b) known to the Receiving Party at the time of disclosure; or (c) rightfully obtained by Receiving Party on a non-confidential basis from a third party.

12.2 The Receiving Party shall not disclose any such Confidential Information to any person or entity, except to the Receiving Party's employees who have a need to know the Confidential Information for the receiving party to perform its obligations hereunder. The Receiving Party shall protect and safeguard the confidentiality of the Disclosing Party's Confidential Information with at least the same degree of care as the Receiving Party would protect its own Confidential Information, but in no event with less than a commercially reasonable degree of care. On the expiration or termination of the Agreement, the Receiving Party shall promptly return to the disclosing party all copies, whether in written, electronic or other form or media, of the Disclosing Party's Confidential Information, or destroy all such copies and certify in writing to the Disclosing Party that such Confidential Information has been destroyed.

13. **WARRANTIES**

    13.1 <u>Mutual Representations and Warranties</u>.  Stocking Distributor and Seller represent and warrant:

    (a) they are under no obligation, whether written or oral, to any third party such that prohibits them from fulfilling obligations under the Agreement;

    (b) that they will not disclose the confidential, trade secret or proprietary information of any third party without the prior written consent of such third party;

    (c) they are (i) are not currently excluded, debarred, or otherwise ineligible to participate in the federal health care programs as defined in 42 U.S.C. § 1320a-7b(f) (the "**Federal Health Care Programs**"), (ii) are not convicted of an offense related to providing health care items or services but have not yet been excluded, debarred, or otherwise declared ineligible to participate in Federal Health Care Programs, and (iii) are not under investigation or otherwise aware of any circumstances that may result in being excluded, debarred, or otherwise found to be ineligible to participate in the Federal Health Care Programs.  Lists of individuals and entities excluded, debarred, or otherwise ineligible to participate in the Federal Health Care Programs may be accessed through the HHS-OIG Cumulative Sanctions Report (http://exclusions.oig.hhs.gov), the General Services Administration List of Parties Excluded from Federal Procurement and Non-Procurement Programs (www.epls.gov/), and the FDA Debarment List (www.fda.gov/ICECI/EnforcementActions/FDADebarmentList/default.htm);

    (d) they have not been, and during the term of this Agreement shall not be: (i) sanctioned within the meaning of Social Security Act Section 1128A or any amendments thereof; (ii) convicted of violating the federal Stark law, federal false claims act, federal anti-kickback statute, federal Health Insurance Portability and Accountability Act ("**HIPAA**") provisions, federal civil money penalties statute, or similar state laws; (iii) the subject of any investigation initiated by any federal or state regulatory agency with respect to the alleged violation of any health care fraud and abuse law (collectively, "**Healthcare Laws**"); or (iv) restricted, limited or suspended to practice any licensed profession in any state;

    (e) it will immediately report to the other Party any suspected violations of any federal or state laws, regulations, including Healthcare Laws, or federal health care program requirements; and

    (f) In the event any representation or warranty made under this Section becomes inaccurate or untrue, they represent and warrant to give the other Party prompt written notice of such.

    13.2 <u>Stocking Distributor Representations and Warranties</u>. Stocking Distributor represents and warrants:

    (a) It shall fully and completely cooperate with Seller in any investigation relating to Stocking Distributor's or Stocking Distributor Personnel activities related to this Agreement, including investigations related to fraud, abuse or potential violations of law;

    (b)   It shall not make or offer to make any payments to Health Care Professionals. "**Health Care Professional**" means anyone who is in a position to purchase, lease, recommend, or use Seller products.  It also means anyone who is in a position to arrange for or influence the purchase, lease or use of Seller's products.  This includes, but is not limited to, physicians, nurses, operating room staff, all medical institution employees regardless of title or level, and all employees of Health Care Professionals;

    (c)   It shall not give or offer to give anything of value (including but not limited to gifts, meals and entertainment) to any Health Care Professional without Seller's prior written consent.

    (d)   It shall not make charitable contributions on behalf of Seller or relating in any way to Health Care Professionals; and

    (e)   It shall not make political contributions on behalf of, or in any way relating to, Seller.

    13.3   <u>Seller Representation and Warranty</u>.  Seller represents and warrants that the Products will: (a) be free from any defects in workmanship, material, and design; (b) be fit for their intended purpose and operate as intended; (c) be merchantable; (d) be free and clear of all liens, security interests, or other encumbrances; and (f) not infringe or misappropriate any third party's patent or other intellectual property rights. These warranties survive any delivery, inspection, acceptance, or payment of or for the Products. These warranties are cumulative and in addition to any other warranty provided by law or equity. Any applicable statute of limitations runs from the date of Stocking Distributor's discovery of the noncompliance of the Products with the foregoing warranties.

14. **INSURANCE OBLIGATIONS**

During the Term, Stocking Distributor shall, at its own expense, maintain and carry in full force and effect, commercial general liability (including product liability) insurance in a sum no less than $1,000,000 with financially sound and reputable insurers. On Seller's request, Stocking Distributor shall provide Seller with a certificate of insurance from Stocking Distributor's insurer evidencing the insurance coverage specified in this Section. The certificate of insurance shall name Seller as an additional insured. Stocking Distributor shall procure and maintain such other insurance coverage as Seller reasonably requires from time to time. Distributor shall provide Seller with five (5) days' advance notice in the event of a cancellation or material change in its insurance policy.

15. **INDEMNIFICATION**

Both Stocking Distributor and Seller (each an "**Indemnitor**") shall indemnify and hold harmless the other Party, the other Party's affiliates, officers, directors, agents and employees ("**Indemnitees**") from and against any and all actual or threatened claims, damages, losses, expenses, actions and liabilities, (including, but not limited to, attorney fees and other expenses incident thereto) made by one or more third parties ("**Claims**") by reason of any injuries to or death of persons or loss of, damage to, or destruction of tangible property arising out of or connected to any act or omission of the Indemnitor relating to or under this Agreement, except to the extent that such Claim arises from the violation of any applicable Federal, State, or local law, including Healthcare Laws, by the Indemnitee or the negligence, gross negligence or willful misconduct of the Indemnitee. Additionally, Seller agrees to indemnify, defend, and hold harmless Stocking Distributor, its affiliates, officers, directors, agents and employees against Claims arising out of or occurring in connection with (i) the Products purchased from Seller and (ii) Stocking Distributor's use or possession of the Products or if Seller's Products infringes or misappropriates the patent, copyright, trade secret, or other intellectual property right of any third party.  Neither Party shall enter into any settlement without the other Party's prior written consent.

16. **LIMITATION OF LIABILITY**

NEITHER PARTY WILL BE LIABLE FOR ANY SPECIAL, EXEMPLARY, PUNITIVE, INDIRECT OR OTHER CONSEQUENTIAL DAMAGES OF ANY KIND (INCLUDING WITHOUT LIMITATION LOST PROFITS OR LOST SAVINGS), WHETHER BASED IN CONTRACT, NEGLIGENCE, TORT OR OTHERWISE, WHICH ARISE OUT OF OR IS IN ANY WAY CONNECTED WITH THIS AGREEMENT OR ANY USE OF THE PRODUCTS EVEN IF THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

17. **MISCELLANEOUS PROVISIONS**

    17.1   <u>Entire Agreement</u>. This Agreement, including and together with any related exhibits, schedules, attachments and appendices, constitutes the sole and entire agreement of the Parties with respect

Complaint Ex A-7

Doc ID: 015d268f41fcccb01f1c30bac1ad19666541ad43

to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, regarding such subject matter. In the event of conflict between the terms of this Agreement and the terms of any purchase order or other document submitted by one Party to the other, this Agreement shall control unless the Parties specifically otherwise agree in writing.

17.2 <u>Governing Law; Submission to Jurisdiction</u>.

    (a)    In the event any lawsuit or legal proceeding is initiated by Stocking Distributor:

        (i)    this Agreement shall be construed and enforced in accordance with the internal laws of the State of Pennsylvania applicable to contracts made and to be performed entirely within the State of Pennsylvania without reference or regard to any conflict of law provisions in either Pennsylvania or any other state or country; and

        (ii)    venue and jurisdiction is the United States District Court for the Eastern District of Pennsylvania or the state courts located in Montgomery County, Pennsylvania for all matters arising between the parties whether arising under this Agreement or otherwise.

    (b)    In the event any lawsuit or legal proceeding is initiated by Seller:

        (i)    this Agreement shall be construed and enforced in accordance with the internal laws of the State of Georgia applicable to contracts made and to be performed entirely within the State of Georgia without reference or regard to any conflict of law provisions in either Georgia or any other state or country; and

        (ii)    venue and jurisdiction is the United States District Court for the Northern District of Georgia or the state courts located in Cobb County, Georgia for all matters arising between the parties whether arising under this Agreement or otherwise.

17.3 <u>Notices</u>. Any notice, request, demand, or other communication required or permitted hereunder shall be deemed properly given when mailed by express, certified, or registered mail, postage prepaid to the attention of the Parties at the addresses provided above, and if to Seller, with a copy sent to the attention of the President, or such other address as the Parties may provide pursuant to this notice provision.

17.4 <u>Force Majeure</u>. Obligations of either Party to perform under this Agreement shall be excused during such period of delay caused by matters such as strikes, shortages of power or raw materials, government orders, or Acts of God, which are reasonably beyond the control of the Party obligated to perform.

17.5 <u>Severability</u>. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon a determination that any term or provision is invalid, illegal or unenforceable, the Parties shall negotiate in good faith to modify this Agreement to effect the original intent of the Parties as closely as possible in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

17.6 <u>Amendments</u>. No amendment to this Agreement is effective unless it is in writing and signed by an authorized representative of each Party. Additionally,

    (a)    In the event that subsequent to the date of this Agreement (i) the contents or validity of this Agreement are challenged by any governmental authority under applicable law, particularly Healthcare Laws, or (ii) that either Party determines, based upon advice received from legal counsel, that a violation of a law, particularly Healthcare Laws has occurred as a result of this Agreement or that a violation of a law, particularly Healthcare Laws will occur as a result of this Agreement, then such Party shall promptly notify the other Party with respect thereto. The Parties shall promptly use reasonable efforts to analyze, revise, reform and, to the extent necessary, restructure this Agreement and the relationship among the Parties in order to fully comply with applicable law in a manner that is equitable to each Party.

    (b)    In the event the parties are unable to formulate a mutually acceptable plan to revise, reform and restructure this Agreement in order to fully comply with all applicable laws within ten (10) days after the Parties initiate negotiations with respect to such plan, then this Agreement shall automatically terminate.

Complaint Ex A-8

17.7 <u>Waiver</u>. Failure by a Party to notify the other party of a breach of any provision of this Agreement shall not constitute a waiver of any continuing breach. Failure of a Party to enforce any of its rights under this Agreement shall not constitute a waiver of those rights. The waiver by either Party of a breach or violation of this Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach of the same or any other provision hereof.

17.8 <u>Cumulative Remedies</u>. All rights and remedies provided in this Agreement are cumulative and not exclusive, and the exercise by either Party of any right or remedy does not preclude the exercise of any other rights or remedies that may now or subsequently be available at law, in equity, by statute, in any other agreement between the Parties or otherwise.

17.9 <u>Assignment</u>. Neither Party may assign any of its rights under this Agreement without the prior written consent of the other Party. The other Party shall not unreasonably withhold or delay its consent. Any purported assignment or delegation in violation of this Section shall be null and void.

17.10 <u>Counterparts</u>. This Agreement may be executed in multiple counterparts, each of which is considered an original for all purposes and all of which together constitute one and the same instrument.

17.11 <u>Successors and Assigns</u>. This Agreement is binding on and inures to the benefit of the Parties to this Agreement and their respective permitted successors and permitted assigns.

17.12 <u>No Third-Party Beneficiaries</u>. This Agreement benefits solely the Parties to this Agreement and their respective permitted successors and assigns, and nothing in this Agreement, express or implied, confers on any other person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

17.13 <u>Return Policy</u>. Any Products bought from Seller have a 30 (thirty) day return policy. After (thirty) 30 days Seller will not take returns.

IN WITNESS WHEREOF, the Parties hereto have caused this Stocking Distribution Agreement to be executed as of the Effective Date specified in the Agreement by their respective officers thereunto duly authorized.

| **RC3 INNOVATIONS, LLC** | **DIO MEDICAL CORPORATION** |
|---|---|
| By: _____ | By: _____ |
| Name: Rob Anderson | Name: AMIT SINHA |
| Title: President | Title: Chief Operating Officer |

**EXHIBIT 1**

| Seller Products | | |
|---|---|---|
| **Brand** | **Category** | **Stocking Pricing*** |
| *Rexious pedicle screw system* | Screw | $469 |
| | Rod | $134 |
| | Set Screw | $47 |
| | Cross Links | $469 |
| *IVA Interbody* | PLIF-PEEK | $1,340 |
| *Fortis Cervical Plate* | 1-lvl Plate | $519 |
| | 2-lvl Plate | $519 |
| | 3-lvl Plate | $519 |
| | 4-lvl Plate | $519 |
| | Screw | $87 |
| | Drill Bit | $34 |
| | Temp. Fixation Pin | $34 |

*The parties agree to revisit pricing in the event of any expansion of the Territory. Purchase orders will reflect Baycare Health System pricing as well as Stocking Pricing.

Complaint Ex A-10

Doc ID: 015d268f41fcccb01f1c30bac1ad19666541ad43

**EXHIBIT 2**

| **Territory** |
|---|
| The territory shall be the following hospitals: Baycare health system (Tampa, FL) (the "Territory"). <br><br> This is a Non-Exclusive agreement, however, **a doctor that has been doing business with Stocking Distributor will be reserved for Stocking Distributor.** <br><br> Excluded Customer: Dr. Anthony Moreno (the "Excluded Customer"). <u>See</u> Section 8.3. (Stocking Distributor is permitted to solicit and make sales to the Excluded Customer as such Excluded Customer is included within the Territory; exclusion only applies for purposes of Section 8.3 of the Agreement and for purposes of determining which customers may be solicited directly by Seller without constituting a breach of Section 8 of the Agreement). |

Complaint Ex A-12

Doc ID: 015d268f41fcccb01f1c30bac1ad19666541ad43



# Audit Trail

| | |
|---|---|
| **TITLE** | Advantage Medical - Stocking Distributor Agreement - Amit... |
| **FILE NAME** | 19-1029 Standard ...v3 FINAL  (1).pdf |
| **DOCUMENT ID** | 015d268f41fcccb01f1c30bac1ad19666541ad43 |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Completed |

## Document History

**SENT** — **10 / 30 / 2019** 11:11:51 UTC-5 — Sent for signature to Robert Anderson (randerson@advantagemed.co) and Amit Sinha (asinha@dio-us.com) from team@inprimelegal.com
IP: 67.166.242.56

**VIEWED** — **10 / 30 / 2019** 11:12:09 UTC-5 — Viewed by Robert Anderson (randerson@advantagemed.co)
IP: 67.187.61.39

**VIEWED** — **10 / 30 / 2019** 11:12:20 UTC-5 — Viewed by Amit Sinha (asinha@dio-us.com)
IP: 74.94.8.142

**SIGNED** — **10 / 30 / 2019** 11:12:36 UTC-5 — Signed by Robert Anderson (randerson@advantagemed.co)
IP: 67.187.61.39

**SIGNED** — **10 / 30 / 2019** 11:15:03 UTC-5 — Signed by Amit Sinha (asinha@dio-us.com)
IP: 74.94.8.142

**COMPLETED** — **10 / 30 / 2019** 11:15:03 UTC-5 — The document has been completed.

Powered by HELLOSIGN

Complaint Ex A-13